Good morning. Good morning, Judge Fletcher. I'm Walter Dellinger, representing UMG, and I would like to reserve five minutes for a response. The question that Judge Fernandez raised in the first argument this morning was, in the larger context of what standard ought there to be for piercing the attorney-client privilege. And I think we have done too little throughout this to note one thing that is not in dispute, and that is that the materials that are to be produced under this order are unquestionably at the very heart of this old and vital privilege. Secondly, I think this would be seen as a very major decision if those clearly privileged materials could be sought and communicated on such a, at best, extremely slender and, we think, nonexistent basis. And thirdly, if you look at the scope of the production order, which we think in any event would be vastly overbroad, you can see that it goes well beyond what anybody could reasonably think would be in furtherance, even of those issues that are raised in this Now, the most fundamental point that I think we start with, because there are many errors below, is that the plaintiffs did not and could not prove falsity. Those charges were not proven, and, in fact, they're not true. The white paper that was submitted to the Justice Department addressed concerns about competitively sensitive information and whether that information would come back to Sony and UMG and lead to coordinated pricing, and I suppose oligopolistic rents, coordinated pricing in the terms on which they license their music to distributors. One of the points that One moment. When you say prove I'm sorry, Judge Fernandez When you say prove, are you using, which standard are you using for prove? I can answer that question any one of three ways. I can tell you, I've looked at this, and I think it's all, everything submitted in the white paper was true. I can tell you that the standard that they have to meet is their requirement to put on evidence which would establish that there was a reasonable cause to believe that the attorney's services were being utilized in furtherance of an ongoing unlawful scheme. And I do think in the Ninth Circuit precedent, in the NRA grand jury proceedings, there is room to say that the standard ought to be at least a preponderance of the evidence under the term must establish reasonable cause to believe. It's not surprising that most of these cases are U.S. versus a criminal defendant, and we're talking about someone actively participating in a criminal scheme. Here, the statements that were made that are in question, that the terms of these contracts that were negotiated by Sony and UMG had significantly different terms, that is indisputably true, obviously on the face of the contracts. And that means, of course, that the spillover was not producing, any spillover was not producing coordinated pricing. More to the point is the fact that the disparities, significant in themselves in the stated terms, were not eradicated. And there is literally no evidence that of equalization. Judge Wallinson correctly said we've got to talk about equal treatment and equal terms in the earlier case. Here, we know what the terms were. The judge first thought there was a concession that these terms were equalized. It turned out not to be the case, as she acknowledged on reconsideration. So then I think she adopted the theory set out at page 9 of the red brief, where it's a theory of spontaneous equalization. The counsel says, quote, if the label's material license terms were disparate, as UMG told the Department, then the rights created by the MFNs had to be triggered. That's how MFNs work. Now, that is not how MFNs work. And I think it's important to look at any of the MFN clauses that were submitted to the Department, and you can see that they are a limited, contingent, uncertain, speculative, and subjective. How many of the MFN clauses that seem now to be in dispute were submitted to the Justice Department as part of the White Paper? The White Paper, there were four pairs of agreements attached to the White Paper. In answer to Judge Rawlinson's questions, we believe that in the general submission to the Department, as far as we know, all of the agreements that we were party to were submitted to the Department. We're not sure about those that came after the date of the production order. There was one attached to the agreement. Four were compared within the agreement. One of the things that is ---- And were the MFN clauses themselves provided to the Justice Department? Absolutely. You can look, for example, at the clauses in the or that large. It's so relevant that on ---- in one of the clauses ---- in one of the contracts that was submitted to the Department, it's point number 10 is most favored nation, and it's an excerpt of record 1225. It is a submitted document, and here's the page, ER 1225. Point number 10, most favored nation, underscored, bolded, and in all caps. This is not something that had to be hidden so that we ---- that was before the Department, before the Antitrust Division, as well as the fact, the only thing we added on reconsideration that's relevant to the Department's knowledge is the letter from the Department of Justice Antitrust Division from James Wade, who is the chief of this litigation section. Their original request of October 17, 2002, asked for information on MFN clauses. In two of the seven requests that they make, they narrowed the list of issues to be ---- matters to be discussed and did not include MFN clauses, which sometimes the division looks like ---- looks at for its own purposes. So that the idea that there was concealment when these clauses were actually submitted to a group of attorneys at the Antitrust Division who are probably the world's leading expert on ---- experts on the operation of MFN clauses and how they may affect, which they ask about and which are clear right on the face of the submitted contracts. But so that's the ---- that eliminates the concealment point. But I want to go on. Roberts. Counsel, I try to ask a question I asked badly before of one of the other counsel. If indeed all the contracts have MFN clauses, how does that give the lie to the basic argument that everybody's getting separate contracts without telling other people what they are? I don't see how if everybody uses MFN clauses, I don't see how the MFN clause itself affects the problem of the joint venture as such. How does that work? How does that connect? Justice Sotomayor, I think that question is right on point if I understand it. This is ---- there are so many ways in which this statement is not false. That is, the recited terms were the different terms. You can see the differences. I just want to point out how significant the differences are. You can look at page 15 of the white paper, which is submitted under seal because it has competitive information in it. The chart on page 15 of the white paper sets out differences in the contracts that were negotiated by different companies. I'll just say hypothetically that one contract provides for a $1 million payment to one of the companies. The other, a $100,000 payment. But all the other terms are different. So you don't know which is the more favorable or which is the least favorable. The one that has the less, gets less money up front for its music gets a higher per subscriber rate. And you're betting on the future. So that at the time you negotiate that contract, you want the best deal you can get. You don't know whether the MF clause will, most favored nation clause will ever be invoked. It's a very uncertain remedy. But in any event, the fact that those terms are different itself alone demonstrates the absence of coordinated pricing of a spillover and would even if, contrary to anything we know about this case, those terms were actually equalized later. Now, so let me go to the point of where they equalized. There is literally no evidence that that's the case. These clauses, if you look at them, provide in some contracts that it's entirely up to the licensee, the person who's distributing the music, to come and tell you that they've given a better deal to someone else. They have to do that in good faith. But it's so subjective whether one of these other complicated agreements is or is not more favorable that it's hard to say that there's a clear duty. Then there is a process by which, in a very limited way, once a year during the term of the contract, you might have you have the right to initiate an independent review by what is called a top-tier national financial services company to come in and assess the contract. You, say UMG, has to pay the entire cost of this, and you get a limited remedy of maybe swapping one agreement for the other. But there has to be, the parties are supposed to work reasonably in good faith to come up with some adjustment. Now, that is quite — whether you could ever succeed in doing that, there is simply no evidence that they submitted that any of the contracts were ever equalized. And the relevant point would be, at the time of negotiating the contract, did the negotiator simply not care what the terms were? I think you'd be fired if you came back and said, I've got an MFN clause in this contract. Okay. Let me take you off the current track for just a moment. Sure. I think I understand the argument whether we agree or disagree for the moment is neither here nor there. But it's heavily dependent upon our understanding of the merits, not only as to whether or not there was a lie or a deliberate misrepresentation amounting to an untruth with the meaning 1001, but this is the guts of the case. This is, let's just say, the substantive case. How can we hear this on collateral order review? I mean, even if we only mean as a kind of term of art that it has to be entirely separate, this is hardly separate at all. I think it is easily separable. And at the end of the day, I'm not afraid of mandamus review, but I'll come to that. But it's easily separable in the sense that you don't have to make any conclusion about the merits of the antitrust counterclaim to review a decision breaching the attorney-client privilege on the basis of no evidence that would falsify the statements that were made and that the judge below conclusively determined that these statements, which themselves are indisputably true and that were false and that other information does not falsify and has not been shown in any way to falsify, that that is the grounds for breaching the attorney-client privilege. And I think that is clear, reversible error and separate from the merits of whether there's a good antitrust claim or not. If there's no evidence that would support a breach of the attorney-client privilege, that issue, I think, is precise and ready for review without you ---- But as it turns out, the very evidence that you say doesn't support vitiating the attorney-client privilege because there's no misrepresentation of the justice requirement, that very same evidence is exactly the evidence that's going to be at the core of the antitrust suit. I understand that to be the case, Judge Fletcher, but that doesn't mean that you have to in any way evaluate that evidence from the ---- from an antitrust perspective. But if I say there is simply no evidence of coordination through the MFN and, therefore, the attorney-client privilege is not vitiated, the inescapable consequence is there's no evidence of coordination through MFN, therefore, no antitrust violation based upon the MFNs. The question before you is not about coordination. It is about whether a false statement was made. Well, I understand that. But what I'm worried about is that this seems to me very closely tied to the merits of the antitrust lawsuit. I think it's one of those cases where it sounds like it's tied to the merits, but it is not because you can look and see that the statement that these terms were disparate was a true statement and that no evidence ---- and, first of all, standing alone, the recited difference in terms is an indication that there was not coordination from spillover. And, secondly, there was no evidence that they were ever equalized. Well, for purposes of this case, what difference does it make if it was ultimately equalized or not? Let's say MFNs, at the end of the day, had the effect of coordinating it eventually. The Justice Department knew there were MFNs, right? Correct. So whether MFNs do ultimately coordinate it or don't ultimately coordinate it, what's the difference for the purpose of the attorney-client privilege? There is none. I think you're precisely right that ---- That's why it's ---- that's why it's ---- it simply doesn't matter what you're going to think about the merits, that all of that is whether there was ultimate equalization doesn't matter. The disparate terms we put forward to show lack of coordination, that was true. Now, I also let me say that ---- No. You wanted to say five. You've got four. I did. And Judge Rollins ---- Judge Rollins said I'll ---- Why doesn't it matter? Why doesn't it matter? Right. The ultimate antitrust merits because no ---- there's no showing that a false statement was made when you put on true evidence of disparate terms that itself demonstrates the lack of coordination and pricing, and even if those terms were later equalized, that would have no effect. Now, I think there's no evidence of later equalization, but whatever the antitrust consequences, it's beside the point. And let me just say that I think in this case, because the ---- that we clearly meet the mandamus standard that this was ---- that this was clearly erroneous, so that ---- so that though I think we are ---- we are clear on the collateral appeal as well. I'll reserve my time. Okay. Mr. Kecker. Good morning again, Your Honor. John Kecker for the Hummer-Winblad defendants. I suspect that the fact that UMG brought Walter Dellinger out to argue a discovery motion before you means that there may be some relationship between this motion and the merits, and I would like to go right to it. You've been hearing about MFNs. This White Paper, as Judge Patel found, did three things, not just MFNs. It emphasized the independence of press play joint venture from its parents. That was a very big point, and I have quotes if you want them. They're in the briefs. They emphasized the impermeability of the firewalls based on the guidelines that they had put into place, and they repeated that several times. And then finally, in the point that gets us to MFNs, they talk about the great dispersion of contract terms being proof that these firewalls are impermeable. It doesn't really matter what your view about MFNs or how they work. That's the argument that they're making. Dispersion equals the firewalls are working. The way the record, and I apologize for this because the record is factually dense, and what we need to do to defend Judge Patel's order is continue to point out to you how reasonable, based on the record, her decision was. The way this press play really worked, as the exhibit showed, is that before press play had a single employee, after it had been talked about and worked on by the partners for a year, they had already worked out their own contract terms with the joint venture, which were to be identical, and they had also gone way down the road negotiating with Warner. So now we've got locked up about 60 percent of the music. Before press play ever had an employee, at supplemental excerpts of record 471, we've got the famous e-mail in which Warner is demanding most favored nations clauses and demanding that, I'll get to in a minute, demanding that the whole industry interlock with MFNs. At the supplemental excerpt of the record 734, it shows Edgar Brothman, the head of UMG, negotiating or negotiating directly with Bob Pittman, the president of AOL Time Warner, about what press play's licenses are going to look like and whether or not Warner is going to be given an MFN. This is in the context of a white paper that talks about the independence of press play from its parents. After press play had employees in April of 2001, UMG still did the negotiating, and that is shown at the supplemental excerpt of record 496. There's a Brothman-UMG instruction. Call Samet at UM at EMI. He can license directly to press play, and UMG can cross. It's Brothman doing the negotiation for this so-called independent entity. The record before Judge Patel also showed that this, that the much lauded independent consultant, which the white paper talks about, this man who's supposed to negotiate the content licenses, Ted Green, Judge Patel cited at ER 181 through 183, this byplay between UMG employees where they're saying, Ted Green, the independent, is not pitching content licenses that way, indicating that they're sitting there listening to him pitch content licenses, which are supposed to be verboten. The response from this Mike Bebel working for UMG is, don't worry about it, we can sit down and debrief him, indicating that they sit and talk about content availability, something, again, that is verboten. They felt free to chat with him. The very next day, this is in April of 2001, and all this is going to independence and impermeability. The very next day, Bebel, who's the UMG employee, is going to go over to Duet, where he is supposed to become a, quote, independent employee. And in SCR 716 and 717, you can read recommendations to Mr. Brothman that before he sends over this employee to become independent, he should sit down and tell him exactly what to do. And then once he gets over the wall where he's supposed to be independent, he can tell the independent, Ted Green, exactly what to do. In short, before press play had any employees, UMG had negotiated with Warner. They primed their designee. Afterwards, they continued to negotiate. That establishes, we believe, reasonable cause to believe that statements about independence and firewalls in this white paper were factually false. But then, in addition, now I'm getting to the, I haven't even mentioned MFNs very substantively yet. In addition, UMG spends 20 pages of its white paper talking about the disparity in license price terms without once mentioning that the key licenses were subject to MFN clauses, not all but the key ones. And, again, because the record is so dense, I think I need to go through it. Sony and UMG licensed press play, the joint venture, and both of them had clauses, Section 16, that says the joint venture shall not enter into any arrangement with any other person on terms that are more favorable than what we've got. And what they got were identical. So A equals B in duet. You know that when MusicNet was formed, EMI is told that it was getting the same terms as BMG and Warner, and so over there, C equals B equals E. And you also know that UMG has this policy for MFNs in all its contracts. EMI has a similar one. And, eventually, UMG is told by the MusicNet CEO that there's a confidential and written contract between MusicNet and the labels concerning how much money will be made by each label over in MusicNet, where UMG has no business being. That's SER 738. UMG is told by Warner that Warner wants a side letter. This is the one. This is the best one. Warner wants a side letter that it will license duet press play, provided that UMG six months later licenses what turned out to be MusicNet and that all of the things had to lock. Nobody could get a more favorable deal than anybody else. So now you've got A equals B equals C equals D equals E. Counsel, what's your response to opposing counsel's position that it doesn't matter if the MNFs equalize the terms bottom line? It does not matter to the piercing of the attorney-client privilege? My response is that when you submit as a factual matter to the Department of Justice representations that this is an independent entity with impermeable firewalls that are not breached, and that one way that you can know that in addition to us telling you is to look at the disparity of terms of the licenses, to not at the same time say, by the way, disparity of terms is completely illusory, because no matter how they look, if this venture is ever successful, and of course it was not successful, our contention below is that it was designed not to be successful, but if this is ever successful, you know that you can pull the trigger on MFNs and get equalized terms. You can have all the disparate terms you want to floating around in the online distribution business, but you know that you have contractual rights or at least the five major labels have contractual rights to equalize and make sure that nobody has an advantage over anybody else. Is it your position that DOJ didn't know about the MFNs? Certainly. DOJ was submitted copies of these contracts and could have figured it out. What DOJ said they didn't know about them, though, you're saying. Well, I don't know what they knew, because nobody at all we know is the DOJ said at the close of the investigation that they bought this argument. The great disparity in price terms shows that there's not a problem here. Napster had been shut down. DOJ says one of the things we looked at was the disparity of these license terms, and we believe that, and that's why we're shutting down the investigation. I don't know how they could have said that. We're not privy to it. I don't know how they could have said that if they had understood the true effect of MFNs on these licenses. They must know what the true effect of MFNs is, because unless they're kind of dull, I mean, everybody knows what the true purpose of them is. It's to bring things together, right? Your Honor, the Department of Justice has human beings working at it. They got millions and millions of documents. They got white papers that we think unfairly characterized what's in those millions and millions of documents. Napster had shut down. This was no longer important. I don't know how much. But didn't they start off saying they were interested in MFNs? They started off with a list of things that they were interested in, and it included MFNs. Okay. So they know that they exist, and they know that they have an effect on terms. They do know that. You keep saying they know, and I just, having dealt with the Department of Justice a lot, I'm hesitant to say, yes, they know. You can the fact that something is in documents. But we're talking about fraud. We're talking about direct misrepresentational fraud. And they have the contracts. They're well aware of what MFNs will do. That's why they're asking about it in the first place. And so why is it fraudulent? Well, the fraud, first of all, to violate 1001, as of course we all know, you don't need to mislead. It doesn't need to be successful. All of that is true. You don't need to prove misleading. I just have to try real hard. I'm sorry. I just have to try. I know. All you have to do is try. To put in, under these circumstances, to put in white papers that purport to summarize millions of pages and characterize millions of pages where the whole point of the investigation has begun to be kind of lost. This was begun when Napster was hot. Napster got shut down. Two years later, these joint ventures had gone nowhere, and the Department of Justice stopped its investigation, making statements that we don't think are consistent with what's in the papers, but making statements that the record labels have continued to use and say, oh, look, they investigated it thoroughly. This much must be true. Of course, that's what severs your attorney-client privilege attack from your ultimate case, too, doesn't it? Because the Department of Justice might be off its head, but the facts are the facts, right? So it really isn't the merits necessarily, whether it's meritorious, your ultimate case is meritorious or not, isn't influenced necessarily by the fact that the DOJ overlooked the MFNs, right? Not necessarily, no, Your Honor. I agree. I agree. That's a distinction. Now, I think this is obvious, but I want to make sure I've got it pinned down correctly. All these MFNs are in front of the Justice Department. They're aware of the contract terms. The contract terms were delivered, the license agreements were delivered to the Justice Department, is our understanding. What in front of or what they know, I don't know. You don't contest that they were delivered to the Justice Department. No, we don't. They were in the building and were submitted by the parties. Okay.  How much of the narrative that you were going through did they know in terms of Bronfen says this, Green says that, and so on? These e-mails were also delivered to the Justice Department. And there was an issue below about redacted form, but we don't need to rely on that now. These were in the e-mails in the millions of pages. Yeah. So I think your claim of violation of 1001 really comes down to the covering characterization in the white paper is not true. And the Justice Department was inundated with so many documents they were incapable of figuring out the truth, even though the documents, once they figured them out, if they had ever been able to do so, would tell the truth. I wouldn't characterize it that way, particularly the part about them being incapable. They didn't. They didn't figure it out. But somebody could have. I mean, because the documents you're relying on to show falsity of the characterization are the documents that the Justice Department had? That's correct. Ooh, that's a tough fraud claim to make out. Well, I mean, United States v. Herod is an example where the Tenth Circuit found somebody mentioning his toy business, and he'd mentioned before that he went. I mean, it may be a tough fraud claim, but it is, for somebody who actually tries these cases, it's a lot easier than a lot of cases that the Justice Department brings. I mean, if you say something that is a misrepresentation, notwithstanding the fact that it was copied to the General Counsel and other people knew and all that sort of thing, those are defense matters in criminal cases. Here, we're not trying to live up to that. We don't need to live up to that standard. We're not talking about beyond a reasonable doubt. We're talking about is there reasonable cause looking at that record. But it's almost a lawyering question. I mean, we just know that lawyers try very hard to submit all the documents that are required to submit, and then to persuade the judge that they don't mean what the documents seem to say. That may be all we do. I hadn't thought about it that way. I certainly hope we do more than that. I shouldn't say that's an all they do, but that is a – that is an important function of lawyers. What I don't like to do, though, is submit, is to say things to a judge that are simply factually wrong, and particularly to do it in so many times and in such a way that it makes it look like we're intentionally trying to mislead the judge about factual matters. Here, the factual matters are independence, impermeability of firewalls, and only really secondarily the fact that this disparity tends to prove the impermeability. This isn't just – I mean, this is not advocacy. If it were purely advocacy, we wouldn't have a case. This is the making of factual state – or Judge Patel found that the record before her established reasonable cause for her to believe that – or for a reasonable person to believe that the predicate had been established for the crime fraud exception. Well, I believe what you're saying is for 1001 purposes – I think you're saying this. I'm sure I've got your argument right. For 1001 purposes, even if what I say to a governmental agency does not mislead it at all, if it has a tendency to mislead it, even though it has facts so it's not misled, if it has a tendency to mislead it, my statement's still false. Is that what you're saying? I'm saying the statement is false if it's factually false that the only element that's required is intent to mislead, that the c inter element has to be found, and materiality, which I think is indisputed here. If you find those things, it doesn't matter that the skeptic you're talking to sees right through you the whole time you're talking. You can be prosecuted – I won't Mr. Dellinger to the appeal on – but you can be prosecuted for walking into a U.S. attorney's office and telling them that the parent company had nothing to do with that. That can be prosecuted as a false statement if it turns out to be wrong. We contend that essentially that's what happened here. What happened at the Justice Department, how they handled the investigation, why they handled the investigation is not something that we're privy to. We don't think it matters to the analysis, except, admittedly, that if you're – as you're trying to balance c inter, but there Judge Patel gets the benefit of the doubt we believe under the abuse of discretion standard. You can – she's the one who in the first instance weighs the evidence that's before her. But help me out with the problem that I alluded to, that is to say the very – your argument as to why the statements in the white paper are untrue is, as I understand it, dependent upon the very documents that were given to the Justice Department. Yes. How can it then be a lie within the meaning of a criminal statute for the parties that you're accusing of having violated the statute have both submitted the documents and then provided an inaccurate description of what's in those documents? If the inaccurate description is made with c inter to mislead, it can be. United States. And Herod pointed out to other documents that the government had that they – if they looked at them, they could have figured out the true – But had, but from what source? From him. From him. He'd previously submitted forms. He'd submitted this form, and then in the past he'd submitted other forms. But the point really is – is not – the false statement, it doesn't matter that you were the stupidest criminal in the world, that how in the world, having submitted your documents, could you walk in and say, I knew nothing about it, when you had given them 30 e-mails that show perfectly well that you did know something about it? And at what point does the White Paper slide over the line from characterization with, in a way, legal conclusion, as to say a firewall that worked, to just a flat lie? I mean, that's a hard line sometimes. What's a characterization with which I disagree, or what's just an outright lie? Our position is that saying that the – that duet press play was independent of its parents was an outright lie under any definition of independence, any definition. Our – we take the same position about these impermeable firewalls and the guidelines being followed. That was, if you carefully parse through these e-mails and can understand them, and they make you blind to try to find in these e-mail strings these – these snippets that we're pulling out, you can put together what, with the benefit of civil litigation and all the money that goes into that, we have put together and gave to Judge Patel. I mean, we all get that. And when you're making written advocacy statements to the – to the Department of Justice, that's one thing. It's an advocacy statement. But when you're making written factual statements to the Department of Justice, we believe that Judge Patel was correct in finding reasonable cause that that could violate 1001. The last thing I wanted to say, and I know I'm out of time, is that we believe, unlike our colleagues, that in any event, the very low Zolan in-camera review standard has been met, and if for any reason the Court does not support Judge Patel's conclusion, we think that the Zolan in-camera review as an alternative should be – should be the remedy. Did you ask for that? We did ask for that. We've asked for it. We asked for it below, and we asked for it in our brief. I mean, we didn't ask for it. We asked to win. But we – if we don't win outright in the sense that we asked for it below, we asked for it in our brief. Let me ask you more precisely. Did you ask for that to Judge Patel? We did. You did. Okay. We did. Thank you. Thank you, Your Honor. Mr. Dellinger. Briefly, for good reason, Judge Patel did not make an independent finding based on the claims of independence. In fact, there is not a single example of a communication in the independence part of her opinion or their brief that is actually outside the guidelines or the firewalls. There are basically two basic – there are two basic mistakes or moves here. One is to confuse the affiliates of our licensees. Press Play was able to partner up with AOL and with Yahoo, and there was no barrier to Sony or UMG being fully involved in those discussions and dealings. None whatsoever. They're not within the firewall, which deals with content providers. Secondly, generally, they take the notion of independence, that you can have a joint venture where the two companies actually have their employees staff it, or you can set it up to be independent where the employees have a fiduciary duty. That is completely separate from the notion of being screened off from this limited amount of information. Sony and UMG were responsible for the supervision and the management of Press Play. There was never any doubt about that. That is told to the department. The department is told that material business decisions have to be approved by a committee consisting of UMG and Sony personnel. There is the email – one example is the email from Ted Green as to – the Ted Green emails that are excerpt of record 182 and 183 were not about pricing or terms. If you look at that email, just start with the very end of it. It's initiated by William E. Pence, PhD, the Chief Technology Officer, about some technological concerns, which were clearly within their responsibility. Now, on – back on the last or the first point. The MFN statements did not falsify the statements about the difference in recited terms, because those statements were themselves correct. The recited terms alone showed the lack of coordinated pricing, regardless of what would happen later with equalization. And there was never any evidence that that equalization occurred. On any of those grounds, it was true. As – in terms of the collateral order doctrine, any time you have an appeal of a privileged document, it involves evidence that one party thinks will help it out on the merits. That does not mean that it isn't collateral. And the appeal is not going to decide the merits of the antitrust dispute, as I think Mr. Kecker conceded. I'll end by saying that the piercing of the privilege is an extraordinary step. And therefore, I think it is quite important that it be reviewed and corrected, in this case, at the first opportunity, because it will never work if you assume that your privilege can be upheld later on appeal at a second trial. Thank you. Okay. Thank you very much. Thank both sides for a useful argument. UMG Recordings v. Hummer-Winblad Venture and UMG Recordings v. United States District Court are both now submitted for decision, and we will be in adjournment until tomorrow morning. Thank you very much. Thank you. Thank you.
judges: Fernandez, W. Fletcher, Rawlinson